UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------

UNITED VETERANS MEMORIAL AND
PATRIOTIC ASSOCIATION OF THE CITY
OF NEW ROCHELLE and PETER PARENTE,

                                     Plaintiffs,                    13-CV-5241 (CS)

            - against -                              **OPINION & ORDER**

CITY OF NEW ROCHELLE, *et al.*,

                                 Defendants.
---------------------------------------------------------------

Seibel, J.

Before the Court is Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint, filed on April 24, 2014. (Doc. 37.) For the reasons stated below, the Motion is GRANTED.

**I.**     **Background**

    A.  Facts

For purposes of this Motion, the Court accepts as true the facts (but not the conclusions) alleged by Plaintiffs in the Second Amended Complaint ("SAC"), (Doc. 27).

Plaintiff United Veterans Memorial and Patriotic Association of the City of New Rochelle ("United Veterans") is an association that "exercise[s] responsibility for all veterans affairs and duties throughout the City of New Rochelle," including organizing the annual Memorial Day and Veterans Day events and numerous other ceremonies.[1] (SAC ¶ 11.) United Veterans acts as the liaison between the City of New Rochelle and several other veterans' groups

---

[1] The SAC states that United Veterans discharges its responsibilities pursuant to "its charter with the City" but does not describe the terms of that charter. (SAC ¶ 80; *see id.* ¶ 11.)

1

and provides services to the community, including teaching schoolchildren about military history and providing support to veterans.  (*Id.* ¶¶ 12-14.)  Plaintiff Peter Parente is the president of United Veterans, a combat veteran and a resident of the City of New Rochelle.  (*Id.* ¶ 16.)

Defendants are the City of New Rochelle ("the City"), City Mayor Noam Bramson, City Manager Charles Strome, and four members of the City Council – Barry Fertel, Ivar Hyden, Shari Rackman and Jared Rice.  (*Id.* ¶¶ 20-24.)

The New Rochelle Armory ("the Armory") was built in 1931 and was an active duty military post until 1997.  (*Id.* ¶¶ 15, 25.)  In 1997, New York State conveyed the Armory to the City by a deed that requires that the property remain open for public use "for park, recreation, street and highway purposes."  (*Id.* ¶¶ 26-27.)  The City "generally granted United Veterans and its predecessor organizations the right to display and maintain flags" on the flagpole located on the grounds of the Armory, which are open and accessible to the general public.  (*Id.* ¶¶ 28, 30.)  Since 1997, Plaintiffs have purchased the flags displayed on the flagpole, replaced those flags when they have become tattered, provided and replaced the rope used to hold the flags, and painted the flagpole and anchors when needed.  (*Id.* ¶¶ 32-35.)  Plaintiffs also paid for and installed a light to illuminate the flagpole.  (*Id.* ¶ 37.)

On March 21, 2013, Plaintiffs held a flag ceremony at the Armory at which they retired a tattered American Flag and replaced it with a new one that had been donated by United Veterans to the City.  (*Id.*)  Below the American Flag, United Veterans hung a historical American flag known as the "Gadsden Flag."  (*Id.* ¶ 38.)  The Gadsden Flag is named after Christopher Gadsden, a Revolutionary War colonel who gave it to the commander-in-chief of the Continental Navy before the Navy's first-ever mission in 1775.  (*Id.* ¶¶ 39, 44.)  The flag is yellow and depicts a coiled rattlesnake above the words "Don't Tread On Me."  (*Id.* ¶ 39.)  The Gadsden

Flag "is of particular importance, meaning and relevance to the New Rochelle Armory" because it is one of only a few U.S. naval armories still in existence. (*Id.* ¶¶ 46-47.) Plaintiffs' purpose in flying the Gadsden Flag at the Armory was "to honor and represent our Nation's proud history and strength, as well as the sacrifices of the many Navy and Marine Corps veterans who have served under the Gadsden Flag throughout our Nation's history." (*Id.* ¶ 48; *see id.* ¶ 76.)

A few days after the flag ceremony, on March 27, 2013, Defendant Strome, the City Manager, emailed Plaintiff Parente that he had received numerous complaints about the Gadsden Flag displayed at the Armory. (*Id.* ¶ 53.) He stated that "in your email to me relative to the ceremony last week, you only mentioned that you would be replacing the American Flag and never mentioned this flag," and that he had been told that it was associated with the Tea Party and had a political message. (*Id.*) Mr. Strome further stated that he had "directed the City's Department of Public Works to remove this flag from the Armory flagpole." (*Id.*) Mr. Parente, who is not a member of the Tea Party (*id.* ¶ 72), replied that the Gadsden Flag has deep-rooted military significance, is non-partisan and pre-dates the Tea Party (*id.* ¶ 54). The following day, Mr. Strome telephoned Mr. Parente and told him that the flag could remain flying. (*Id.* ¶ 55.) Later that day, however, Mr. Strome emailed Mr. Parente and told him that "a majority of the New Rochelle City Council has requested that the flag be removed [and as] a result, the Public Works Department will remove the flag." (*Id.* ¶ 56.) The flag was taken down from the flagpole later that day. (*Id.* ¶ 59.)

On April 9, 2013, at a City Council meeting, a City Council member made a motion to allow the Gadsden Flag to fly on the Armory's flagpole. (*Id.* ¶ 66.) Prior to hearing any public comments on the issue, the City Council voted down the motion five to two. (*Id.*) The votes

against the motion were cast by five of the Defendants in this case – Mayor Bramson and City Council Members Fertel, Hyden, Rackman and Rice.[2] (*Id.*)

Prior to the March 2013 removal of the flag, Defendants "never sought to intervene in any aspect of how United Veterans fulfills its rights and responsibilities" and never complained about any of the flags that Plaintiffs had previously displayed on the Armory's flagpole (which included the Gadsden Flag). (*Id.* ¶¶ 36, 77-78.) Nor had the City ever required that United Veterans obtain permission before flying a certain flag on the flagpole. (*Id.* ¶ 36.)

B. Procedural History

Plaintiffs bring two claims. First, they sue under 42 U.S.C. § 1983 for violation of the Fourteenth Amendment and the Free Speech Clause of the First Amendment of the U.S. Constitution, based on Defendants' removal of the Gadsden Flag. (*Id.* ¶¶ 83-87.) Second, they sue for violation of the New York Open Meetings Law, Public Officers Law §§ 100, 103(a), 104(1)-(2), based on the March 28, 2013 decision of Defendants Bramson, Fertel, Hyden, Rackman and Rice to remove the flag without holding a meeting on the topic that was open to the public. (*Id.* ¶¶ 88-93.) Among other things, Plaintiffs request an order permanently enjoining the City from preventing Plaintiffs from flying the Gadsden Flag on the Armory flagpole.

Defendants have moved to dismiss both claims under Federal Rule of Civil Procedure 12(b)(6). Defendants argue that Plaintiffs fail to state any claim on which relief can be granted and that the individual defendants are protected by qualified and legislative immunity.[3]

---

[2] During the meeting, City Council Member Rice said that the Gadsden Flag was "divisive" because it represents "a brand of politics that is very offensive to many people in America and many people in New Rochelle." (SAC ¶ 68.) Defendants Rackman, Fertel and Bramson expressed similar sentiments at or just after the meeting. (*Id.* ¶¶ 69-71.)

[3] *See* Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint, Doc. 39.

**II.     Discussion**

     A.  Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

     In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (alteration omitted) (quoting Fed. R.. Civ. P. 8(a)(2)).  "[W]hen the allegations in a

5

complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (internal quotations and alterations omitted); *see Hoover v. Ronwin*, 466 U.S. 558, 587 (1984).

    B.  First Amendment Claim

The government's own speech is not subject to First Amendment scrutiny. *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005). "A government entity has the right to speak for itself." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) (internal quotation marks omitted); *see Latino Officers Ass'n, N.Y., Inc. v. City of New York*, 196 F.3d 458, 468 (2d Cir. 1999) ("[I]t is well settled that the government may regulate its own expression in ways that would be unconstitutional were a private party the speaker.") Barring other limitations on its speech (such as the Establishment Clause), the government "is entitled to say what it wishes and to select the views that it wants to express." *Summum*, 555 U.S. at 467-68 (internal quotation marks and citations omitted). This is the case even when the government "receives assistance from private sources" to convey its message. *See id.* at 468. The government is not unaccountable, however, because citizens who do not approve of their government's messages can vote their representatives out of office. *Id.* at 468-69; *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 331 n.9 (1st Cir. 2009).

The Free Speech Clause does apply to private speech that takes place on government property. "Where the government seeks to restrict [private] speech by restricting access to its own property, the level of scrutiny to which the restriction is subjected depends on how the property is categorized as a forum for speech." *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 880 F. Supp. 2d 456, 469 (S.D.N.Y. 2012); *see Cornelius v. NAACP Legal Def. & Educ.*

6

*Fund, Inc.*, 473 U.S. 788, 800 (1985).  Government property can be categorized as a traditional public forum (a space like the public square, "immemorially . . . held in trust for the use of the public"), a designated public forum (purposefully opened by the government as a forum for public expression) or a non-public forum.  *Summum*, 555 U.S. at 469-70; *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 679 n.11 (2010).  But because the Free Speech Clause does not restrict government speech, forum analysis does not apply at all when the government is speaking for itself.  *See Summum*, 555 U.S. at 480-81.

*Pleasant Grove City, Utah v. Summum*, the leading case on the government-speech doctrine, provides guidance on how to determine whether the government is speaking itself or is providing a forum for private speech.  In that case, Summum, a private religious organization, requested permission to erect a stone monument containing the Seven Aphorisms of Summum in a park in Pleasant Grove City, Utah.  *Id.* at 464-65.  The park already contained fifteen permanent monuments (including a Ten Commandments monument), most of which were donated by private entities.  *Id.*  After the city government denied Summum's requests, Summum sued, claiming that by rejecting its donation but accepting the Ten Commandments monument, the city had violated Summum's Free Speech rights by discriminating based on viewpoint.  *Id.* at 466.  The Supreme Court disagreed with Summum, holding that "the placement of a permanent monument in a public park is best viewed as a form of government speech and is therefore not subject to scrutiny under the Free Speech Clause." *Id.* at 464.  "Permanent monuments displayed on public property typically represent government speech," the Court explained, based on the historical significance and purpose of monuments and because "persons who observe donated monuments routinely – and reasonably – interpret them as conveying some message on the property owner's [*i.e.*, the government's] behalf." *Id.* at 470-71.

7

*Summum* did not announce a test for identifying government speech, but it placed considerable emphasis on whether, based on all the circumstances, a reasonable observer would have concluded that the government was the speaker. *See Tex. Div., Sons of Confederate Veterans, Inc. v. Vandergriff*, 759 F.3d 388, 394 (5th Cir. 2014) (proper inquiry under *Summum* is whether reasonable and fully informed observer would understand the expression to be government speech as opposed to private speech government chooses to allow), *cert. granted sub nom. Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, No. 14-144, 2014 WL 3890320 (U.S. Dec. 5, 2014); *A.C.L.U. v. Tata*, 742 F.3d 563, 570-71 (4th Cir. 2014) (same); *Roach v. Stouffer*, 560 F.3d 860, 867 (8th Cir. 2009) (same); *see also Choose Life Ill., Inc. v. White*, 547 F.3d 853, 863 (7th Cir. 2008) (pre-*Summum* case stating same). Accordingly, to determine whether the government-speech doctrine applies in this case, the Court will consider whether the circumstances here would have led a reasonable observer to believe that the Gadsden Flag flying at the Armory was government speech or private speech in a public forum.

Accepting the facts in the SAC as true, it is not plausible that a reasonable observer would consider the Gadsden Flag flying at the Armory to be private speech, and it is obvious that the flag would be regarded as government speech. *See Summum*, 555 U.S. at 481 (Stevens, J., concurring) (noting "near certainty that observers will associate permanent displays with the government property owner"). The parallels between this case and *Summum* are numerous. The Armory and its flagpole are owned by the City, (SAC ¶¶ 26-27), and flags, like monuments, are reasonably interpreted "as conveying [a] message on the property owner's behalf," *Summum*, 555 U.S. at 471. And like the monuments in *Summum*, the flagpole is located in a public space used for park and recreation purposes. (SAC ¶¶ 27-29.) Like most public parks, the Armory is

"closely identified in the public mind with the government unit that owns the land" – the City of New Rochelle.[4]  *Summum*, 555 U.S. at 472.

Plaintiffs argue that *Summum* is distinguishable because it concerned permanent monuments.[5]  But because United Veterans' flags are displayed for long periods of time (until they become tattered) and then promptly replaced, (*see* SAC ¶¶ 35, 37), their presence at the Armory is nearly as constant as that of the park monuments in *Summum*.  Monuments and flags are both distinctly more enduring than speeches, parades, protests and other transient forms of expression.  *See Summum*, 555 U.S. at 478-79.  Furthermore, while the permanence of the monuments was an important factor in *Summum*, it was not dispositive.  Other government speech cases not involving permanent structures demonstrate that the government-speech doctrine is not as narrow as Plaintiffs contend.  *See, e.g.*, *Sutliffe*, 584 F.3d at 329 (town's choice not to include private group's hyperlink on town website was government speech).[6]

Plaintiffs do not dispute that reasonable observers would have perceived the Armory's Gadsden Flag to be government speech.  Instead, they argue that under *Summum*, "government speech analysis turns on the essential fact that the government maintains continuous control over the medium of communication," and that the City "deferred control" of the flagpole to Plaintiffs for sixteen years.  (Ps' Opp. 6.)  But *Summum* did not endorse a control-based test for

---

[4] According to the SAC, after United Veterans put up the Gadsden Flag, the City Manager told Plaintiff Parente that several people called the City administration to complain about what they considered to be an improper political message.  (SAC ¶ 53.)  Plaintiffs do not allege that anyone called United Veterans about the flag.  That actual observers called *the City* to complain about the flag, if true, would demonstrate that reasonable observers attributed the flag's message to the government.

[5] *See* Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss, ("Ps' Opp."), (Doc. 40), 4-5, 8.

[6] Contrary to Plaintiffs' position, the instant case is not analogous to *Coe v. Town of Blooming Grove*.  (*See* Ps' Opp. 5-6).  In *Coe*, the government had purposefully opened up the town lawn for speech by private groups and then selectively enforced its liability insurance requirement against one of the groups.  429 F. App'x 55, 57-58 (2d Cir. 2011) (summary order).  The Second Circuit held that the town lawn was "at a minimum . . . a limited public forum" for private speech, and that no government speech was involved.  *Id.* at 57.  As will be discussed further below, the Armory flagpole is not a public forum as Plaintiffs do not allege that the City opened up the Armory flagpole to speech from any other groups.

9

government speech, as two Circuit Courts have recently held. *See Sons of Confederate Veterans*, 759 F.3d at 394 ("*Summum*, however, shows that 'the Supreme Court did not espouse a myopic 'control test'") (quoting *Tata*, 742 F.3d at 570). *But see Sutliffe*, 584 F.3d at 331-33. Although the Supreme Court noted that Pleasant Grove City "effectively controlled the messages sent by the monuments in the Park by exercising final approval authority over their selection," its analysis was not focused on control but on the identity of the speaker in the eyes of a reasonable observer. *See Summum*, 555 U.S. at 472-74 (internal quotation marks omitted) ("[A]lthough respondent argues that Pleasant Grove City has not adequately 'controlled the message' of the Ten Commandments monument, the City . . . unmistakably *signif[ied] to all Park visitors* that the City intends the monument to speak on its behalf.") (citations and alternation omitted, emphasis added).

Even if Plaintiffs were correct that a control test governed, the City clearly possessed sufficient control of the flagpole to be deemed the speaker, and for it to be implausible that the flagpole was turned over the Plaintiffs for any and all messages it wished to convey. The Armory and its flagpole are owned by the City and when the City decided to remove the Gadsden Flag, it did so, exercising the control that it had possessed as the property owner since 1997. (*See* SAC ¶¶ 56, 59, 66.) Plaintiffs argue that they gained the right to control the Armory's flags either pursuant to a charter from the City or by virtue of the fact that they exercised responsibility for the flags for sixteen years without interference by the City.[7] (*See* Ps' Opp. 6-7.) But these allegations are conclusory at best. Plaintiffs do not plead facts plausibly

---

[7] City Manager Strome's March 27, 2013 email mentions that Mr. Parente had informed the City in advance of the March 21, 2013 flag ceremony that United Veterans would be replacing the American flag, suggesting that United Veterans did not exercise its flag-related responsibilities without any City oversight. (*See* SAC ¶ 53.) Plaintiffs argue that Mr. Parente's pre-ceremony email was simply a courtesy and not a request for permission. (Ps' Opp. 10.) But even if United Veterans had operated without any City oversight, the City's ownership of the Armory and its flagpole, and the absence of any indication that Plaintiffs could do whatever they wanted with the flagpole, *see* note 9 below, suffice to establish the City's right to control what flags are displayed there.

10

demonstrating that they have either a property or a contractual right to control the flags; if they did, they likely would have sued to enforce such a right rather than indirectly asserting those rights via this First Amendment claim.  They point to no document or even oral communication by the City suggesting that Plaintiffs were free to put any sort of message they wanted on the flagpole.[8]  Rather, the City's delegation of responsibility to Plaintiffs is simply an example of a government "enlist[ing] private entities to convey its own message," *Summum*, 555 U.S. at 468 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)) – a situation in which the government entity is "permitted . . . to regulate the content of what is or is not expressed," *Rosenberger*, 515 U.S. at 833.[9]

Further reinforcing the conclusion that the flying of the Gadsden Flag was government speech is the incompatibility of the facts of this case with Free Speech Clause forum analysis.  Plaintiffs make two arguments as to the applicable forum here.  First, they argue that the Armory grounds constitute a traditional public forum.  (Ps' Opp. 17-18.)  While that may be true, *see Summum*, 555 U.S. at 469, the grounds are not the relevant forum in this case because Plaintiffs seek access to a more limited channel of communication – the Armory flagpole, *see Cornelius*, 473 U.S. at 801 ("In cases in which limited access is sought, our cases have taken a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property.").  Second, as to the flagpole itself, Plaintiffs contend that the City designated it as a public forum "limited to use by . . . Plaintiffs or dedicated solely to the discussion of . . .

---

[8] That the City never had occasion to speak up until now does not plausibly suggest indifference to the message sent on the flagpole; one can easily imagine the reaction if Plaintiffs had flown a pro-choice or anti-marriage-equality or other politically fraught banner.  Plaintiff's "charter" to serve as the City's liaison for veteran's affairs does not plausibly suggest authority to speak for the City on matters with (even unintended) political implications.

[9] Additionally, Defendants are correct that if the City had given or loaned Armory property (by charter or otherwise) to Plaintiffs, such an arrangement would violate the Gift and Loan Clause of the New York Constitution, *see* Art. VIII, § 1, and (barring specific legislative approval) New York's public trust doctrine, *see Lake George Steamboat Co. v. Blais*, 30 N.Y.2d 48, 51 (1972).  Plaintiffs' conclusory allegation that the City has unlawfully conveyed control rights to United Veterans cannot "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

11

veterans' affairs and military history." (Ps' Opp. 17-18) (alterations omitted). But Plaintiffs have not alleged facts demonstrating that the City purposefully designated the flagpole for *public* discussion of this topic. In fact, they state the opposite – that United Veterans has been the only group to display flags on the flagpole for the past sixteen years and that it has exclusive access to it pursuant to a charter from the City. (SAC ¶¶ 11, 30; *see* Ps' Opp. 6-7, 11-12.) But "selective access, unsupported by evidence of a purposeful designation for public use, does not create a public forum." *Cornelius*, 473 U.S. at 805; *see Hotel Emps. & Rest. Emps. Union v. N.Y.C. Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002) (limited public forum not created where government allows selective access for individual speakers rather than general access for a class of speakers).

The facts here are simply unsuitable for forum analysis, which is generally "applied in situations in which government-owned property . . . [is] capable of accommodating a large number of public speakers without defeating the essential function of the land." *Summum*, 555 U.S. at 478. The Armory flagpole is not designed to accommodate a large number of speakers (either simultaneously or seriatim). *See Freedom from Religion Found., Inc. v. City of Warren*, 707 F.3d 686, 698 (6th Cir. 2013) ("[A] forum approach does not properly apply . . . when the sought-after space is finite in terms of the structures or symbols it could accommodate."). Nor should the City be required to permit a limitless number of speakers (*i.e.*, flags), which could create a flood of messages that make it impossible for the City to convey its own message. *See Sutliffe*, 584 F.3d at 334; *Ill. Dunesland Pres. Soc'y v. Ill. Dep't Natural Res.*, 584 F.3d 719, 725-26 (7th Cir. 2009). That forum analysis does not fit these facts further demonstrates that the flagpole "is not a form of expression to which forum analysis applies," but "is best viewed as a

form of government speech."  *Summum*, 555 U.S. at 464; *see Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 672-73 (1998).

Finally, the relief that Plaintiffs request here – an injunction permanently permitting them to fly the Gadsden Flag at the Armory – would, by compelling the government to speak, itself "raise[] risks to values protected by the First Amendment."  *See Sutliffe*, 584 F.3d at 332 n.10.  While the Court does not doubt the sincerity of Plaintiffs' intention to use the Gadsden Flag to honor veterans and U.S. military history, the message that the flag conveys cannot be determined by Plaintiffs or any speaker; it is in the eye of the beholder.  Flags have great symbolic potential and can hold multiple meanings at the same time – meanings that can shift over time, as apparently has happened to the Gadsden Flag as a result of its association in recent years with the Tea Party movement.  *See Summum*, 555 U.S. at 474-78.  The City has a valid interest in expressing the messages that it chooses through its flagpole, and may decide to avoid speech that it believes will be perceived by some of its constituents as divisive.  Indeed, because it is the City – not United Veterans – that is perceived as the speaker, the City is the entity accountable for whatever message observers perceive in the Armory's flags.  Plaintiffs are not being prevented from expressing their own views through other channels – they may fly the Gadsden flag on private property and in public fora.  Their private speech is not being inhibited by the City's decision to take down the Gadsden Flag, but the City's expressive rights would be diminished were this Court to order the City to display the flag against its wishes.

In conclusion, construing the facts pleaded by Plaintiffs in the light most favorable to them, *see Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 118 (2d Cir. 2013), the display of the Gadsden Flag at the Armory was government speech, which is not regulated by the Free Speech

Clause of the First Amendment.[10]  Because there is no constitutional violation as a matter of law, Plaintiffs' First Amendment claim must be dismissed under Rule 12(b)(6) for failure to state a claim.

### C. New York Open Meetings Law Claim

After disposing of the First Amendment claim, there are no federal claims left to try.  The "traditional 'values of judicial economy, convenience, fairness, and comity'" usually weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial.  *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction.").  Having considered the *Cohill* factors, the Court concludes that this is the "usual case" in which they "point toward declining to exercise jurisdiction over the remaining state-law claims."  *Cohill*, 484 U.S. at 350 n.7.  Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law claim.

### D. Leave to Amend

Leave to amend a complaint should be freely given "when justice so requires."  Fed. R.. Civ. P. 15(a)(2).  It is "within the sound discretion of the district court to grant or deny leave to amend."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  "Leave to amend, though liberally granted, may properly be denied for:  'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously

---

[10] The "heckler's veto" argument made by Plaintiffs – that a "bedrock First Amendment principle" is that "government officials may not restrict speech based on [a] listener's reaction," (*see* Ps' Opp. 12-14) – is irrelevant because the First Amendment does not apply here.  Even if it did, that doctrine simply means that private speech cannot be suppressed because some find it offensive.  *See Texas v. Johnson*, 491 U.S. 397, 414 (1989).  It does not means that the government has to adopt that speech.

14

allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiffs have already amended their complaint twice, (*see* Docs. 1, 13, 27), once in response to Defendants' pre-motion letter, (*see* Doc. 24), and the Court's observations about Plaintiffs' claims during a conference (*see* 12/20/13 minute entry). Plaintiff's failure to fix the deficiencies identified above after being provided with notice of them, is alone sufficient ground to deny leave to amend *sua sponte*. *See In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007). Furthermore, here the reason for dismissal is substantive, and better pleading would not lead to a different result. *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *Ariel (UK) Ltd. v. Reuters Grp., PLC*, 277 F. App'x 43, 45-46 (2d Cir. 2008) (summary order) (district court did not exceed its discretion in not *sua sponte* granting leave to amend where plaintiff had already amended complaint once and amendment would have been futile); *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (leave to amend should be denied as futile where problem with complaint is substantive and better pleading would not cure it); *Payne v. Malemathew*, No. 09-CV-1634, 2011 WL 3043920, at *5 (S.D.N.Y. July 22, 2011) ("That Plaintiff was provided notice of his pleading deficiencies and the opportunity to cure them is sufficient ground to deny leave to amend *sua sponte*."). Accordingly, there being no indication that Plaintiffs are in possession of facts that could cure the problem, I decline to grant Plaintiffs leave to amend *sua sponte*.

## III.     Conclusion

For the reasons stated above, Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint is GRANTED.  The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 37), and close the case.

**SO ORDERED.**

Dated:   December 22, 2014
           White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.